1

LAW OFFICES
**GRAHAM • VAAGE LLP**
500 NORTH BRAND BOULEVARD
SUITE 1030
**GLENDALE, CALIFORNIA 91203**
(818) 547-4800  FAX (818) 547-3100
Susan L. Vaage, SBN 83125
Ann G. Lee, SBN 252412

Attorneys for Adan Orellana and Telma Villalobos

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re:<br><br>JORGE EDUARDO ANDRADE,<br><br>                              Debtor.<br><br>ADAN ORELLANA and TELMA VILLALOBOS,<br><br>                              Plaintiffs,<br><br>     vs.<br><br>JORGE EDUARDO ANDRADE,<br><br>                              Defendant. | Chapter 7<br><br>**CASE NO. 2:12-bk-24969-ER**<br><br>**ADV. NO.**<br><br>**COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF DEBT**<br>**11 U.S.C. §§523(a)(2), 523(a)(4), 523(a)(6)**<br><br>**Date:**<br>**Time:**       (To be set)<br>**Place:** |

TO DEBTOR JORGE EDUARDO ANDRADE AND HIS ATTORNEY OF RECORD:

Plaintiffs ADAN ORELLANA and TELMA VILLALOBOS (hereinafter cumulatively referred to as "Plaintiffs") by and through their counsel of record, Graham • Vaage LLP, allege as follows:

///

///

1

## I.

## FIRST CLAIM FOR RELIEF

(Non-dischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(A))

1.      On April 27, 2012, Jorge Eduardo Andrade (hereinafter "Andrade" or "Defendant"), the Defendant herein, filed a Voluntary Petition for Relief under Chapter 7 of Title 11 of the United States Code. David A. Gill is the duly appointed and acting Chapter 7 Trustee for the Estate of Jorge Eduardo Andrade.

2.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157 and 11 U.S.C. §523. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(I).

3.      At all times herein mentioned, Plaintiffs Adan Orellana and Telma Villalobos were and are individuals. Hereinafter all references to "Plaintiffs" shall be referring to Adan Orellana and Telma Villalobos.

4.      That July 30, 2012 was fixed by the Court as the last date for filing objections to the discharge of the Defendant and for filing of complaints as provided in 11 U.S.C. §523(c), to determine the dischargeability of debts claimed to be non-dischargeable, and this date was subsequently extended to September 28, 2012 pursuant to a Stipulation between Chapter 7 Trustee David A. Gill and Defendant Andrade.

5.      That among the debts owed by Andrade is an obligation owed to Plaintiffs in the unpaid sum of at least $547,000.00 in principal, plus interest, fees and costs.

6.      Plaintiffs met Defendant Andrade, a loan broker, several years ago when they were referred to Andrade and he assisted Plaintiffs with refinancing one of their homes as an agent of Ameriquest, and also assisted Plaintiffs with obtaining a line of credit from Bank of America which was secured by another one of Plaintiffs' properties. As Andrade was successful in helping Plaintiffs obtain said refinance loan and line of credit, and as Andrade repeatedly emphasized to Plaintiffs that he had connections within the banking industry, Plaintiffs reasonably reposed great trust and confidence in Andrade. As Plaintiffs' assigned loan broker for said prior transactions, Andrade had access to Plaintiffs' personal financial information. Plaintiffs Adan and Telma are originally from Guatemala and El Salvador, respectively, and are unable to speak or read English

2

GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4800 FAX (818) 547-3100

1  fluently or with any ease.  At all times relevant herein, Andrade, who is a native Spanish speaker,

2  was aware of Plaintiffs' inability to speak English fluently, inability to read English, financial

3  inexperience, and established tendency to rely upon the advice and good will of others in dealing

4  with their properties; Andrade has intentionally taken advantage of Plaintiffs' vulnerability and

5  language limitations, using his prior experience and knowledge gained through acting as Plaintiffs'

6  loan broker previously, in committing the fraudulent acts alleged herein.

7        7.      Sometime in 2007, Andrade represented to Plaintiffs that Washington Mutual Bank

8  was offering a new loan product through him and that a loan restructure would quickly pay off the

9  first deed of trust on their residential real property located at 4813 Laurelgrove Ave., Valley

10  Village, CA 91607 ("Laurelgrove").  Plaintiffs believe and are advised that Andrade took out a

11  loan ("Loan 1") from Washington Mutual Bank, now JPMorgan Chase Bank, N.A. ("Chase"), in

12  Plaintiffs' names, which was secured by a second-priority deed of trust on Laurelgrove.  In order

13  to induce Plaintiffs to sign the loan documents which they could not read or understand, Andrade

14  made representations to them that the loan documents were necessary for a bank-promoted

15  refinance which would more quickly pay off their original loan as a result of higher monthly

16  payments.  In reliance thereon, Plaintiffs signed the loan documents for Loan 1, even though they

17  were unable to read said loan documents.  Andrade fraudulently concealed the fact that the loan

18  documents were actually for a second loan and deed of trust on Laurelgrove, and further

19  fraudulently concealed his intent to take possession of the loan proceeds for his own use and

20  benefit.

21        8.      Plaintiffs first discovered the existence of Loan 1 at the end of October 2011 when

22  they received a letter by certified mail regarding a default on Loan 1 in the approximate amount of

23  $3,500.00, which Plaintiffs knew nothing about.  A true and correct copy of said letter dated

24  October 24, 2011 is attached hereto, marked Exhibit "1".  Plaintiffs inquired about Loan 1, and

25  Chase informed Plaintiffs that an advance in the amount of $287,000.00 dated September 21, 2007

26  was transferred to a checking account ending in 5824, which account Plaintiffs also knew nothing

27  about.  A true and correct copy of the letter from Chase dated January 5, 2012 is attached hereto,

28  marked Exhibit "2".  Plaintiffs believe that Andrade opened a checking account in Adan's name, in

GRAHAM · VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4600 FAX (818) 547-3100

3

which the loan proceeds were deposited, and wrote checks against it.  A representative at a Chase bank branch in Studio City, California informed Adan that payments and/or statements for Loan 1 were sent to 14673 Parthenia Street, Panorama City, CA 91402 ("Parthenia"), an address unknown to Plaintiffs.  Thereafter, Adan went to Parthenia and saw Andrade working in an unmarked office on the second floor of that location.  Adan attempted to speak to Andrade about Loan 1, but upon being seen, Andrade quickly left the building.  In January 2012, Plaintiffs filed a police report against Andrade.  A true and correct copy of said police report is attached hereto, marked Exhibit "3".  (Personal information such as dates of birth and driver's license numbers have been redacted for privacy.)

9.    Plaintiffs believe that as a result of Andrade's default on Loan 1, Chase has initiated or will initiate foreclosure proceedings on Laurelgrove.

10.    At all times relevant to this matter, a confidential and fiduciary relationship existed between Plaintiffs and Andrade, by virtue of their prior broker-client relationship, as a result of which Plaintiffs reasonably reposed great trust and confidence in Andrade.  By making the fraudulent representations and committing the fraudulent acts described herein, Andrade took advantage of Plaintiffs.

11.    Plaintiffs allege that despite having voluntarily induced and accepted the trust and confidence reposed in Andrade by Plaintiffs with respect to Andrade's representations regarding Loan 1 secured by Laurelgrove, and in violation of this relationship of trust and confidence, Andrade abused the trust and confidence of Plaintiffs by (1) fraudulently inducing them to execute loan documents securing a second deed of trust on Laurelgrove, which Plaintiffs did not want or need, (2) taking the loan proceeds from Loan 1 for his own use, and (3) allowing Loan 1 to go into default, thereby putting Laurelgrove at risk of foreclosure.

12.    Sometime in 2007, Andrade represented to Plaintiffs that a loan restructure would quickly pay off the first deed of trust on their real property located at 5902 Colfax Ave., Los Angeles (North Hollywood), CA 91601 ("Colfax").  Andrade took out a loan ("Loan 2") from Downey Savings and Loan Association, F.A., now U.S. Bancorp doing business as U.S. Bank ("U.S. Bank"), in Adan's name, which was consolidated with the existing loan previously taken

GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4800 FAX (818) 547-3100

4

out by Plaintiffs and secured by a first-priority deed of trust on Colfax.  In order to induce Adan to sign the loan documents which he could not read or understand, Andrade made representations to Plaintiffs that the loan documents were necessary for a refinance which would more quickly pay off their original loan as a result of higher monthly payments.  In reliance thereon, Adan signed the loan documents for Loan 2, even though he was unable to read said loan documents.  Andrade fraudulently concealed the fact that the loan documents were actually for a loan which was consolidating the previous loan taken out by Plaintiffs and a new loan taken out by Andrade for his own use, secured by a first deed of trust on Colfax, and Andrade further fraudulently concealed his intent to take possession of the loan proceeds for his own use and benefit.

13.    Plaintiffs first discovered the existence of Loan 2 in or about February 2012 when they began looking closer at their finances and the mortgages on their various properties as a result of Andrade's fraudulent activity with respect to their Laurelgrove property which they had discovered.  Plaintiffs inquired about Loan 2, and U.S. Bank sent a copy of an Adjustable Rate Note for the principal sum of $454,000.00, secured by a deed of trust on Colfax.  A true and correct copy of the letter and copy of the Adjustable Rate Note from U.S. Bank dated February 10, 2012 is attached hereto, marked Exhibit "4".  Plaintiffs believe that Andrade opened a checking account in Adan's name, in which the loan proceeds were deposited, and wrote checks against it. Plaintiffs continued making payments on Loan 2, the consolidation loan fraudulently procured by Andrade, believing that they were paying down the balance owed on the original smaller loan they had previously taken out on Colfax at the accelerated rate as represented by Andrade.  Plaintiffs believe that Andrade appropriated loan proceeds of at least $260,000.00 from Loan 2.

14.    Plaintiffs believe that as a result of Andrade's default on Loan 2, U.S. Bank has initiated or will initiate foreclosure proceedings on Colfax.

15.    At all times relevant to this matter, a confidential and fiduciary relationship existed between Plaintiffs and Andrade, by virtue of their prior broker-client relationship, as a result of which Plaintiffs reposed great trust and confidence in Andrade.  By making the fraudulent representations and committing the fraudulent acts described herein, Andrade took advantage of Plaintiffs.

5

GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4800  FAX (818) 547-3100

16. Despite having voluntarily induced and accepted the trust and confidence reposed in Andrade by Plaintiffs with respect to Andrade's representations regarding Loan 2 secured by Colfax, and in violation of this relationship of trust and confidence, Andrade abused the trust and confidence of Plaintiffs by (1) fraudulently inducing Adan to execute loan documents for a new consolidation loan secured by a first deed of trust on Colfax, which Plaintiffs did not want or need, (2) taking the loan proceeds from Loan 2 for his own use, and (3) allowing Loan 2 to go into default, thereby putting Colfax at risk of foreclosure.

17. Andrade did the acts herein alleged with the intent to deceive and defraud Plaintiffs, and Andrade covenanted, warranted and represented that Loan 1 and Loan 2 were in Plaintiffs' best interest and would enable them to more quickly pay off the indebtedness secured by Laurelgrove and Colfax. Plaintiffs are further informed that Andrade made such representations with the intent to induce reliance by Plaintiffs in the continuing fidelity of Andrade and to convince Plaintiffs to execute the loan documents for Loan 1 and Loan 2, which Plaintiffs did execute, although they could neither read nor understand them. Had Plaintiffs been aware of Andrade's secret intent to personally take possession of the loan proceeds from the Loans and of the fact that the Loans created significant additional indebtedness for them and liens on Laurelgrove and Colfax which Plaintiffs never sought or intended, Plaintiffs would not have executed the loan documents.

18. Plaintiffs placed trust and confidence and relied on Andrade until after Andrade caused Loan 1 and Loan 2 to go into default. Plaintiffs reasonably relied on Andrade by virtue of the representations made by Andrade that the Loans were in their best interest. Plaintiffs' reliance was reasonable and justifiable in that they had a previous broker-client relationship with Andrade and had grown to trust him.

19. On September 6, 2012, Plaintiffs instituted litigation against Andrade in Los Angeles County Superior Court, Case No. BC491754 ("State Court Action"). Plaintiffs' complaint contained causes of action for fraud, rescission, declaratory relief, accounting, and unjust enrichment. In the course of attempting to serve Andrade with the summons and complaint in the State Court Action, Plaintiffs discovered that Andrade had filed for bankruptcy. Andrade did not

6

GRAHAM · VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4800 FAX (818) 547-3100

1    list Plaintiffs as creditors in his Schedules, nor did Andrade give notice of his bankruptcy to

2    Plaintiffs.

3        20.    As a result of the fraud and deceit of Andrade, Plaintiffs have been damaged in an

4    amount according to proof, but no less than $547,000, plus interest, fees and costs incurred herein.

5        21.    Pursuant to 11 U.S.C. Section 523(a)(2)(A), the debt incurred by Andrade to

6    Plaintiffs is non-dischargeable.

7                                      II.

8                        SECOND CLAIM FOR RELIEF

9        (Non-dischargeability of Debt Pursuant to 11 U.S.C. §523(a)(4))

10       22.    Plaintiffs repeat and reallege the allegations contained in their First Claim for

11   Relief, and by reference thereto incorporate the same herein as though more fully set forth.

12       23.    At all times relevant to this matter, a confidential and fiduciary relationship existed

13   between Plaintiffs and Andrade, by virtue of their prior broker-client relationship, as a result of

14   which Plaintiffs reposed great trust and confidence in Andrade.  By making the fraudulent

15   representations and committing the fraudulent acts described herein, Andrade took advantage of

16   Plaintiffs.  Before the events described herein, Andrade was Plaintiffs' loan broker for two prior

17   transactions wherein Andrade assisted Plaintiffs with refinancing one of their homes and obtaining

18   a line of credit secured by another property.  As Andrade was successful in helping Plaintiffs

19   obtain said refinance loan and line of credit, and as Andrade repeatedly emphasized to Plaintiffs

20   that he had connections within the banking industry, Plaintiffs reposed great trust and confidence

21   in Andrade.  As Plaintiffs' assigned loan broker for said transactions, Andrade had access to

22   Plaintiffs' personal financial information.  Andrade has intentionally taken advantage of Plaintiffs'

23   vulnerability and language limitations, using his position as Plaintiffs' loan broker to commit the

24   fraudulent acts alleged herein.

25       24.    Alternatively, even if no fiduciary relationship is found to have existed between the

26   parties, the debt owed by Andrade is non-dischargeable as a result of the larceny committed by

27   Andrade when he took, or stole, the loan proceeds from Loan 1 and Loan 2 with the fraudulent

28   intent to convert same.  Through his intentional fraudulent representations, Andrade fraudulently

7

GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4600 FAX (818) 547-3100

appropriated the loan proceeds from Loan 1 and Loan 2 to his own use.  Andrade represented that Loan 1 and Loan 2 were in Plaintiffs' best interest and would enable them to more quickly pay off the indebtedness secured by Laurelgrove and Colfax, and that Andrade made such representations with the intent to induce Plaintiffs' reliance in the continuing fidelity of Andrade and to convince Plaintiffs to execute the loan documents for Loan 1 and Loan 2, which Plaintiffs did execute, although they could neither read nor understand them.  Had Plaintiffs been aware of Andrade's secret intent to personally take possession of the loan proceeds from the Loans and of the fact that the Loans created significant additional indebtedness on Laurelgrove and Colfax which Plaintiffs never sought or intended, Plaintiffs would not have executed the loan documents.

25.    As a result of Andrade's fraud, willful and intentional breach of his fiduciary obligations to Plaintiffs, and/or larceny, Plaintiffs have been damaged in the sum of at least $547,000.00, plus interest, attorneys' fees and costs.

26.    Pursuant to 11 U.S.C. Section 523(a)(4), the debt incurred by Andrade to Plaintiffs is non-dischargeable.

III.

THIRD CLAIM FOR RELIEF

(Non-dischargeability of Debt Pursuant to 11 U.S.C. §523(a)(6))

27.    Plaintiffs repeat and reallege the allegations contained in their First and Second Claims for Relief, and by reference thereto incorporate the same herein as though more fully set forth.

28.    As a result of Andrade's fraudulent representations, Andrade received the loan proceeds from Loan 1 and Loan 2, in excess of $547,000.00.  Andrade appropriated said loan proceeds even though the Loans were executed by Plaintiffs and created significant additional indebtedness on Laurelgrove and Colfax, properties owned by Plaintiffs, not Andrade.  Andrade further failed and refused to refund said funds back to Chase and U.S. Bank or to Plaintiffs, instead converting said funds to his own personal use.  The funds taken by Andrade were obtained upon false pretenses and Andrade's fraudulent representations.  Plaintiffs allege that

GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4800 FAX (818) 547-5100

1 | Andrade knew, or should have known, that his actions would injure Plaintiffs. Andrade's actions

2 | constitute willful and intentional injury to the property of Plaintiffs.

3 |    29.    Andrade, by means of false and fraudulent actions, intentionally misappropriated

4 | and converted the loan proceeds from Loan 1 and Loan 2 to his own personal use and possession,

5 | and deprived Plaintiffs of the possession and use of said funds, causing Plaintiffs to be damaged

6 | in the sum of at least $547,000.00 plus interest.

7 |    30.    Plaintiffs allege that Andrade committed further acts of fraud, including obtaining

8 | other loan funds from financial institutions without repaying Plaintiffs, Chase, or U.S. Bank, and

9 | instead converting said funds and assets to his own personal use.

10 |    31.    The alleged acts committed by Andrade were done by him knowingly, willfully,

11 | and in complete disregard of the rights of Plaintiffs and the obligations owed by Andrade to

12 | Plaintiffs as their loan broker. Andrade clearly knew that he misappropriated the loan proceeds,

13 | but failed and refused to return same, thus requiring that Plaintiffs file a state court lawsuit, pay

14 | an attorney and file the within adversary proceeding without repaying anything. The fees and

15 | costs incurred by Plaintiffs in the State Court Action and in the instant action were directly

16 | caused by Andrade's failure to repay what was owing.

17 |    32.    As a result of Andrade's actions, Andrade willfully and maliciously injured

18 | Plaintiffs in the sum of at least $547,000.00 plus interest, attorneys' fees and costs.

19 |    33.    Pursuant to 11 U.S.C. § 523(a)(6), the debt incurred by Andrade to Plaintiffs is

20 | non-dischargeable.

21 |                                    IV.

22 |                                  PRAYER

23 | WHEREFORE, Plaintiffs request of this court as follows:

24 | AS TO THE FIRST CLAIM FOR RELIEF:

25 |    1.    For a determination of non-dischargeability of debt pursuant to 11 U.S.C.

26 | §523(a)(2)(A);

27 |    2.    For judgment in a principal amount according to proof, but not less than

28 | $547,000.00, plus interest at the legal rate of interest from the date of execution of the loan

GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4800 FAX (818) 547-3100

9

1  documents for Loan 1 and Loan 2, until paid in full or date of entry of judgment;

2      <u>AS TO THE SECOND CLAIM FOR RELIEF</u>:

3      3.    For a determination of non-dischargeability of debt pursuant to 11 U.S.C.

4  §523(a)(4);

5      4.    For judgment in a principal amount according to proof, but not less than

6  $547,000.00, plus interest at the legal rate of interest from the date of execution of the loan

7  documents for Loan 1 and Loan 2, until paid in full or date of entry of judgment;

8      <u>AS TO THE THIRD CLAIM FOR RELIEF</u>:

9      5.    For a determination of non-dischargeability of debt pursuant to 11 U.S.C.

10  §523(a)(6);

11      6.    For judgment in a principal amount according to proof, but not less than

12  $547,000.00, plus interest at the legal rate of interest from the date of execution of the loan

13  documents for Loan 1 and Loan 2, until paid in full or date of entry of judgment;

14      <u>AS TO ALL CLAIMS FOR RELIEF</u>:

15      7.    For reasonable attorneys' fees incurred;

16      8.    For costs of suit herein incurred; and

17      9.    For such other and further relief as this Court may deem just and proper.

18  Date:  September 26, 2012        **GRAHAM • VAAGE LLP**

19

20          By: _Ann G. Lee_

21          **SUSAN L. VAAGE**
        **ANN G. LEE**
        Attorneys for Plaintiffs

22          Adan Orellana and Telma Villalobos

23

24

25

26

27

28

<div style="writing-mode: vertical-rl">GRAHAM • VAAGE LLP
500 NORTH BRAND BOULEVARD, SUITE 1030
GLENDALE, CALIFORNIA 91203
(818) 547-4600 FAX (818) 547-3100</div>

10

**EXHIBIT 1**

Chase (FL5-7735)
PO BOX 44090
Jacksonville, FL 32231-4090

**CHASE** 

October 24, 2011



### Return Service Requested
5-746-61036-0002968-001-01-000-010-000-000

ORELLANA,ADAN
4813 LAURELGROVE AVE
VALLEY VLG CA 91607-3611

**Acceleration Warning (Notice of Intent to Foreclose)**
Account: ***************4274
Property Address:    4813 LAURELGROVE AVE
                     VALLEY VILLAGE CA 91607

Dear Orellana,Adan:

Under the terms of the Note and Mortgage, Deed of Trust, or other security agreement ("Security Instrument") securing your Loan, JPMorgan Chase Bank, N.A. ("Chase") hereby notifies you of the following:

1. You are in default because you have failed to pay the required monthly installments commencing with the payment due June 11, 2011.

2. As of October 24, 2011, total monthly payments (including principal and interest) and late fees due under the terms of your loan documents in the total amount of $3,505.77 are past due. Chase reserves the right to adjust this amount, as appropriate.

   This amount may also include, but is not limited to, taxes, inspection fees, and other fees, as permitted by your loan documents and applicable law. If applicable, your account may have additional escrow amounts that have been paid out and are due on the Loan. You are also responsible for paying any amounts that become due from the date of this letter through the expiration date set forth in Paragraph 3 below.

   We may currently be holding money in suspense. This amount is reflected on your Loan as a credit and will be deducted from any reinstatement or payoff figures.

   If you have any questions about any of these amounts, please contact us as soon as possible at (800) 219-6659.

3. Action required to cure the default: You must pay the total amount set forth in Paragraph 2 within 35 days from the date of this notice in order to cure this default. If any other fees and advances are due on your account, those are still valid and will need to be repaid under the terms of your loan documents.

4. If you fail to cure the default within 35 days from the date of this notice, Chase will accelerate the maturity of the Loan, terminate your credit line if the Loan provides for revolving advances, declare all sums secured by the Security Instrument immediately due and payable, and commence foreclosure proceedings, all without further notice to you. If this happens, Chase will be entitled to collect its expenses incurred in pursuing the remedies provided in the Security Instrument, which may include, but not be limited to, allowable foreclosure/attorney fees, and other expenses permitted by applicable law.

5. If permitted by applicable law, you have the right to reinstate after acceleration of the Loan and the right to bring a court action to assert the nonexistence of a default, or any other defense to acceleration, foreclosure, and sale. However, the amount required to reinstate may be higher than what is owed under Paragraph 2 above due to additional fees and charges that we are entitled to collect under the Loan, including attorney fees related to any foreclosure action we initiate.

6. Kindly remit the total amount due, shown in Paragraph 2 above, to the remittance address listed below. Please note that Chase policy requires certified funds if two insufficient funds (NSF) payments have been received in the last six months. In this event, Chase will not accept a Direct Check, FastPay or SpeedPay.

|                | |
|----------------|--|
| Regular Mail:  | Chase<br>Attention HE Default Payment Processing<br>Mail Code OH4-7164<br>PO BOX 24785<br>Columbus, OH 43224-0785 |
| Overnight Mail: | Chase<br>Attention HE Default Payment Processing<br>Mail Code OH4-7164<br>3415 Vision Drive<br>Columbus, OH 43219-6009 |

Except as required by law, we are under no obligation to accept less than the full amount owed. If you send us less than the full amount owed, we may in our sole discretion apply such partial payment to your Loan without waiving any default or waiving our right to accelerate the Loan and continue with foreclosure proceedings in accordance with Paragraph 4 above.

7. If you are unable to pay the amount past due, Chase has a variety of homeowners' assistance programs that might help you resolve your default and keep your home; however, we need to talk with you to discuss these options and determine which of them might be appropriate for your circumstances. Please call us as soon as possible at (800) 219-6659.

8. While the Loan remains in default, we will perform certain tasks to protect our interest in the Property, including visits to your Property at regular intervals during the default. This will be done to determine, as of the date of the inspection, the property condition, occupancy status, and possibly your plans for curing the default and paying this Loan on time. You should anticipate that any costs incurred by Chase will be added to the amount you now owe if permitted by your loan documents or applicable law.

Chase offers homeownership counseling services to borrowers in some areas. Counseling is also available through a variety of nonprofit organizations experienced in homeownership counseling and approved by the Secretary of Housing and Urban Development (HUD). A listing of such organizations may be obtained by calling HUD toll-free at (800) 569-4287 or at www.hud.gov.

Sincerely,

Chase
(800) 219-6659
(800) 582-0542 TDD / Text Telephone
www.chase.com

Enclosures

- Federal Trade Commission Pamphlet

**EXHIBIT 2**

Chase (OH4-7170)
3415 Vision Drive
Columbus, OH 43219-6009



January 05, 2012

Adan Orellana
14673 Parthenia St Ste 207
Panorama City, CA 91402

Re:  Account Number **********4274

**Home Equity Advance**

Dear Adan Orellana:

I am writing in response to your recent inquiry to Chase about an advance or advances posted on your home equity account referenced above.

Upon review of your account, we have determined that the advance in the amount of $287,000.00 dated September 21, 2007 was transferred to your checking account ending in 5854.  Please find the checking account statement attached.

We appreciate your business. If you have questions, please call us at the telephone number below.

Sincerely,

*Melodie Martinez*

Melodie G. Martinez
Chase Home Lending
(800) 836-5656 Customer Care
(800) 582-0542 TDD / Text Telephone
www.chase.com

SV321

**EXHIBIT 3**

Page ___ of ___
03.01.00

**Los Angeles Police Department**
**INVESTIGATIVE REPORT**

DR NO. ___
INC # ___

## CASE SCREENING FACTOR(S)

- [ ] SUSPECT/VEH NOT SEEN
- [ ] PRINTS OR OTHER EVIDENCE NOT PRESENT
- [x] NO MO DISTINCT
- [x] PROPERTY LOSS LESS THAN $5,000
- [x] NO SERIOUS INJURY TO VICTIM
- [ ] ONLY ONE VICTIM INVOLVED

CTC/ROBB MAJOR CRIMES

FORGERY
CC.

**VICTIM**
LAST NAME, FIRST, MIDDLE (OR NAME OF BUSINESS) — ORELLANA, ADAN
SEX: M   DESC: H
ADDRESS
R- 4813 Laurel Grove Av   Valley Village 91601   ZIP   PHONE: ___
B-
E-MAIL ADDRESS
CELL PHONE: ___
FOREIGN LANGUAGE SPOKEN: Spanish
OCCUPATION: Air conditioning

**PREMISES** (SPECIFIC TYPE)   [ ] ATM

SHOTS FIRED

**ENTRY** 459/BFV POINT OF ENTRY
- [ ] FRONT
- [ ] REAR
- [ ] SIDE
- [ ] ROOF
- [ ] FLOOR
- [ ] OTHER

POINT OF EXIT

METHOD

INSTRUMENT/TOOL USED

LOCATION OF OCCURRENCE

SAME AS V'S   [x] RES.   [ ] BUS.   R.D. ___
PRINTS BY PREL. INV.
ATTEMPT [ ] Y  [x] N
OBTAINED [ ] Y  [x] N

DATE & TIME OF OCCURRENCE
10-28-11   1300

DATE & TIME REPORTED TO PD
1-19-12   1100

TYPE PROPERTY STOLEN/LOST/DAMAGED   03.04.00 GIVEN
U.S. Currency

STOLEN/LOST $ 287000   RECOVERED $ ----   EST. DAMAGED ARSON / VAND. $ ___

USE OF FORCE

**VICT'S VEH.** (IF INVOLVED) YEAR, MAKE, TYPE, COLOR, LIC. NO.

NOTIFICATION(S) (PERSON & DIVISION)   CONNECTED REPORTS (TYPE & DR #)

**MO** IF LONG FORM, LIST UNIQUE ACTIONS. IF SHORT FORM, DESCRIBE SUSPECT'S ACTIONS IN BRIEF PHRASES, INCLUDING WEAPON USED, DO NOT REPEAT ABOVE INFO BUT CLARIFY REPORT AS NECESSARY. IF ANY OF THE MISSING ITEMS ARE POTENTIALLY IDENTIFIABLE, ITEMIZE AND DESCRIBE ALL ITEMS MISSING IN THIS INCIDENT IN THE NARRATIVE.

Vict Hired susp to Refinance his Home. Vict later found out that susp used Vict's info and opened a line of credit on Vict's 2nd Home w/o Vict's knowledge.

NARCOTICS STOLEN/GUND

MANDATORY MARSY'S RIGHTS CARD PROVIDED TO THE VICTIM [x]
SUSPICIOUS ACTIVITY (SAR)
HATE CRIME/INCIDENT
DOMESTIC VIOLENCE

**REPORTING EMPLOYEE(S)**
INITIALS, LAST NAME: O. Pedemonte   SERIAL NO. 39131   DIV/DETAIL: NHWD Desk
PERSON REPORTING: Adan H Orellana Jr
SIGNATURE
OR RECEIVED BY PHONE [ ]
NOTE: IF SHORT FORM AND VICTIM/PR ARE NOT THE SAME, ENTER PR INFORMATION IN INVOLVED PERSONS SECTION.

Complete below sections if any CASE SCREENING FACTOR(S) boxes are not checked.

| SUSP'S VEHICLE | YEAR | MAKE | MODEL | TYPE | Interior | Exterior | Body | Windows |
|---|---|---|---|---|---|---|---|---|
| | | | | | COLOR: | | | |

**Interior:**
- [ ] BUCKET SEATS
- [ ] DAMAGED INSIDE

**Exterior:**
- [ ] 1 CUSTOM WHEELS
- [ ] 2 PAINTED W/SCRIPT
- [ ] 3 LEVEL ALTERED
- [ ] 4 RUST/PRIMER
- [ ] 5 CUSTOM PAINT
- [ ] 6 VINYL TOP

**Body:**
- [ ] 1 DAMAGE
- [ ] 2 MODIFIED
- [ ] 3 STICKER
- [ ] 4 LEFT
- [ ] 5 RIGHT
- [ ] 6 FRONT
- [ ] 7 REAR

**Windows:**
- [ ] 1 DAMAGE
- [ ] 2 CUST.
- [ ] 3 CURTAINS
- [ ] 4 LEFT
- [ ] 5 RIGHT
- [ ] 6 FRONT
- [ ] 7 REAR

COLOR(S): N/C   VEH. LIC. NO.   STATE

DND/OID

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | AGE | CLOTHING | NAME, ADDRESS, DOB, IF KNOWN; NAME, BKG, NO., CHARGE, IF ARRESTED. |
|---|---|---|---|---|---|---|---|---|---|
| S-1 | M | H | BLK | BLU | 600 | 230 | 41 | | Andrade, Jorge 6952 Amigo Av Reseda |

PERSONAL ODDITIES (UNUSUAL FEATURES, SCARS, TATTOOS, ETC.): Acne Scars
WEAPON (VERBAL THREATS, BODILY FORCE, SIMULATED GUN, ETC. IF KNIFE OR GUN, DESCRIBE FULLY.)

| | SEX | DESC | HAIR | EYES | HEIGHT | WEIGHT | AGE | CLOTHING | NAME, ADDRESS, DOB, IF KNOWN; NAME, BKG, NO., CHARGE, IF ARRESTED. |
|---|---|---|---|---|---|---|---|---|---|
| S-2 | | | | | | | | | |

PERSONAL ODDITIES (UNUSUAL FEATURES, SCARS, TATTOOS, ETC.)
WEAPON (VERBAL THREATS, BODILY FORCE, SIMULATED GUN, ETC. IF KNIFE OR GUN, DESCRIBE FULLY.)

**INVOLVED PERSON(S)** W - WITNESS;  R - PERSON RPTG.;  S - PERSON SECURING (459);  D - PERSON DISCOVERING (459);  P - PARENT;
CP - CONTACT PERSON (DOMESTIC VIOLENCE)  IP - INVOLVED PARTY

| NAME | SEX | DESC | DOB | ADDRESS | CITY | ZIP | PHONE |
|---|---|---|---|---|---|---|---|
| | | | R- | | | | |
| DR. LIC. NO. (IF NONE, LIST OTHER ID & NO.) | FOREIGN LANGUAGE SPOKEN | | B- | | | | |
| | | | E-MAIL ADDRESS | | CELL PHONE | | |

| NAME | SEX | DESC | DOB | ADDRESS | CITY | ZIP | PHONE |
|---|---|---|---|---|---|---|---|
| | | | R- | | | | |
| DR. LIC. NO. (IF NONE, LIST OTHER ID & NO.) | FOREIGN LANGUAGE SPOKEN | | B- | | | | |
| | | | E-MAIL ADDRESS | | CELL PHONE | | |

| NAME | SEX | DESC | DOB | ADDRESS | CITY | ZIP | PHONE |
|---|---|---|---|---|---|---|---|
| | | | R- | | | | |
| DR. LIC. NO. (IF NONE, LIST OTHER ID & NO.) | FOREIGN LANGUAGE SPOKEN | | B- | | | | |
| | | | E-MAIL ADDRESS | | CELL PHONE | | |

FIREARM STOLEN/LOST - DSVD & RAI CRIME PROPERTY TT SUPVR

CHILD ABUSE JUVENILE DIV.

| COMBINED EVID. RPT. | USE THIS SECTION IN LIEU OF PROPERTY REPORT IF NO GUN AND NO MORE THAN THREE ITEMS OF EVIDENCE. | LOC. EVID. BKD. | 10.10.00 GIVEN? [ ] Y [ ] N | Preliminary Drug Test | SUPV/INV. OFCR. TESTING SERIAL NO. | WITNESS OFCR. | SERIAL NO. |
|---|---|---|---|---|---|---|---|
| ITEM | QUAN. | ARTICLE | SERIAL NO./TYPE TEST OF DRUG | BRAND/DRUG WEIGHT, UNITS | MODEL NO./DRUG TEST RESULT | MISC. | |

EXTRA COPIES

**NARRATIVE** USE THE FOLLOWING HEADINGS TO DOCUMENT ALL INFORMATION REGARDING THE INVESTIGATION: ADDITIONAL PERSONS INVOLVED (separated by type); SOURCE OF ACTIVITY; INVESTIGATION; ARREST; INJURY/MEDICAL TREATMENT; PHOTOGRAPHS; BOOKING; EVIDENCE; ADDITIONAL; COLLISION SUMMARY; PROPERTY STOLEN/LOST/RECOVERED/DAMAGED; AND COURT INFORMATION. IF THESE HEADINGS MAY BE OMITTED IF NOT APPLICABLE. SEE FIELD NOTEBOOK DIVIDER - GENERAL REPORTING INSTRUCTIONS, FORM 18.30.00 AND FIELD NOTEBOOK DIVIDER - IR, FORM 18.30.01 FOR FURTHER INFORMATION.

VICTIM INDEMNIFICATION INFORMATION (IF APPLICABLE)
IS ANY OF THE VICTIM'S PROPERTY MARKED WITH AN OWNER APPLIED IDENTIFICATION NUMBER? [ ] YES [ ] NO
IF YES, EXPLAIN IN NARRATIVE.

**APPROVAL AND REVIEW**
SUPERVISOR APPROVING   SERIAL NO.   DIVISION   DETECTIVE SUPERVISOR REVIEWING   SERIAL NO.
DATE & TIME REPRODUCED   CLERK   DIVISION

Other Information

Other information or comments that may help in our investigation of your claim:

Forgery, identity theft against Adán H. Orellana without his knowledge that Jorge Andrade (lender) used him because of his not knowing any English and utilized him in a credit-line of the property at 4813 Laurelgrove Ave. Valley Village CA 91607. Which the property had nothing to do with any credit-line and tricked him with putting addresses that Adán H. Orellana has no knowledge of.

① Example: Adán H. Orellana has no defaults and pays his mortgage on time.

② Example ②: Adán H. Orellana is a hard working person that works in (Delivering) at Studio Air Conditioning, INC. — A copy of working letter will be send.

③ Example ③: Adán H. Orellana is no lender and does not have two jobs and has no idea "where" that: job is at 14673 Parthenia St., Panorama City CA 91402 came from. Adán H. Orellana knew about this address in Panorama City because Chase Bank Branch in Studio City CA told him that the payments of the credit-line were send there. And there were mounts of defaults concurring the credit-line. When, Chase Bank gave Adán H. Orellana the address of Panorama City Adán H. Orellana went to that address and reconized (the lender) Jorge Andrade working there alone and in an office up stairs / second floor with no suite # or anything. Once, Adán H. Orellana saw Jorge Andrade to confront him about the situation "Jorge Andrade denied himself and left the building. In Conclusion, Adán H. Orellana knew that Jorge Andrade is behind all this situation because he refinanced one other property located in North Hollywood back in 2005 and Jorge Andrade did a credit-line with Bank of America with Adán H. Orellana's authorization. Located at: 12308 La Maida St. Valley Village CA 91607. Adán H. Orellana and his spouse Telma Villalobos are paying their mortage and Bank of America credit-line on time. Now from one situation back in 2007 Adán H. Orellana's home at 12308 La Maida St. Valley Village CA 91607 was burglarized with Adán H Orellana and his spouse Telma Villalobos's safe box only Jorge Andrade ② suspect knew about the money of the credit-line of 12308 La Maida St. Valley Village CA 91607 because Jorge Andrade came to Adán H. Orellana's home to do the Bank of America credit-line paperwork and Jorge Andrade was the only person who knew and did everything of the two other properties and tricked Adán H. Orellana's property located at 4813 Laurelgrove Ave. Valley Village CA 91607 into all this delinquent mess with a credit-line of almost $300,000.00 Jorge Andrade has all of Adán H. Orellana documents. Jorge Andrade is a fraud and knows that there are more victims, this Jorge Andrade delinquent needs to be put in jail and has emotionally effected Adán H. Orellana feelings and health and Family too. safety. Adán H. Orellana has no enemies, no other lending no- nothing. Jorge Andrade stoled Adán H. Orellana confidence, identity and was behind so spam so that Adán H. Orellana would lose his property (foreclose). Foreclose Justice must be served and god is watching everything that's going on. Jorge Andrade is an evil person he's done so much harm to so many people. Investigate Jorge Andrade (Chase Bank) there has to be a chain with the Bank and with more victims. Chase Bank must find evidence with transactions, phone calls etc. Adán H. Orellana is innocent.

Written by Adán H. Orellana's daughter: Dailana Orellana                Dailana Orellana

**Please return this questionnaire along with your Social Security Card (copy), photo ID (copy)
and police report.**

**EXHIBIT 4**



All of **us** serving you®

3121 Michelson Drive, Suite 500
Irvine, CA 92612

February 10, 2012

Adan Orellana
12308 LA Maida St
Valley Village, CA 91607 3606

Re: Loan No.

Dear Mortgagor(s):

Pursuant to your request, enclosed is the following:

( ) Loan History

(x ) Copy of Note

( ) Copy of Deed of Trust / Mortgage

( ) Copy of Form 1098 Mortgage Interest Statement

( ) Other:

If you need assistance, please feel free to contact our Customer Service
Department at 1-800-824-6902.

Sincerely,

Customer Service Department

CS020

Member FDIC



# ADJUSTABLE RATE NOTE
### (Cost of Funds Index - Payment and Rate Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.**

| | | |
|---|---|---|
| September 20, 2007 | WEST HILLS | CA |
| [Date] | [City] | [State] |

5902 COLFAX AVENUE, LOS ANGELES, CA  91601

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $   454,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **Downey Savings and Loan Association, F.A.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  Until the first day of the calendar month that immediately precedes the first payment date set forth in Section 3(A) below, I will pay interest at a yearly rate of 7.577 %.  Thereafter, until the first Interest Change Date (as defined in Section 2(B) below), I will pay interest at a yearly rate of 2.000 %.  The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### (B) Interest Change Dates

The interest rate I will pay may change on the first day of    November    ,    2007    , and on that day every month thereafter.  Each date on which my interest rate could change is called an "Interest Change Date."  The new rate of interest will become effective on each Interest Change Date.

### (C) Interest Rate Limit

My interest rate will never be greater than    10.950    %.

### (D) Index

Beginning with the first Interest Change Date, my interest rate will be based on an Index.  The "Index" is the monthly weighted average cost of savings, borrowings and advances of members of the Federal Home Loan Bank of San Francisco (the "Bank"), as made available by the Bank.  The most recent Index figure available as of the date 15 days before each Interest Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information.  The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Change Date, the Note Holder will calculate my new interest rate by adding **three and three tenth(s)** percentage point(s) (3.300 %) to the Current Index.  Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Change Date.

A100 (PREPAY)
MULTI STATE ADJUSTABLE RATE NOTE - Cost of Funds Index - Single Family
1896N1.UFF (05/10/04) CR12697 RG                    Page 1 of 4                    Initials: _____                    1/01

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on **November 1** **2007** . I will make these payments every month until I have paid all the Principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before Principal. If, on **October 1, 2037** , I still owe amounts under this Note, I will pay these amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **P.O. Box 6060, 3501 Jamboree Rd, Newport Beach, CA 92658-6060** or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be U.S. $ **1,678.08** . This amount may change.

### (C) Monthly Payment Changes

My monthly payment may change as required by Section 3(D) below beginning on the first day of **November** **,** **2008** , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment.

I will pay the amount of my new monthly payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new monthly payment will be in the amount of the Full Payment, except that my new monthly payment will be limited to an amount that will not be more than 7.5% greater or less than the amount of my last monthly payment due before the Payment Change Date.

### (E) Additions to My Unpaid Principal

My monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above.

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to one hundred **fifteen** percent ( **115** %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that maximum due to the limited payments and interest rate increases. If so, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. The new monthly payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date at my current interest rate in substantially equal payments.

### (G) Required Full Payment

On the 5th Payment Change Date and on each succeeding 5th Payment Change Date thereafter, I will begin paying the Full Payment as my monthly payment until my monthly payment changes again. I also will begin paying the Full Payment as my monthly payment on the final Payment Change Date.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**A100 (PREPAY)**

1896N2.UFF (04/23/02) 10881 VC                    Page 2 of 4                    Initials: _A HO_                    1/01



## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of          15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000          % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.


_Adan H Orellan_ _____ (Seal)
ADAN ORELLANA                     -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

_____ (Seal)
                                 -Borrower

[Sign Original Only]


**A100 (PREPAY)**
1896N4.UFF 10/16/2002 11215 JS            Page 4 of 4            Initials: _A.H.O_    1/01

## RIDER TO PROMISSORY NOTE AND SECURITY INSTRUMENT

Loan Number:                                      Date: September 20, 2007

Property Address: 5902 COLFAX AVENUE, LOS ANGELES, CA 91601

This Rider is hereby incorporated into that certain deed of trust/mortgage (Security Instrument), and that certain promissory note (Note), both dated the same date as this Rider executed by Borrower in favor of Downey Savings and Loan Association, F.A. (Lender or Note Holder). Anyone who takes the Note by transfer and who is entitled to receive payments under the Note is also called the Note Holder. All capitalized terms used but not defined in this Rider shall have the same meaning as set forth in the Note and Security Instrument. To the extent that any provisions in this Rider are inconsistent with the Security Instrument and/or the Note, this Rider shall prevail. This Rider is secured by the Security Instrument.

If the Federal Home Loan Mortgage Corporation (FHLMC), the Federal National Mortgage Association (FNMA) or any other investor buys all or some of Lender's rights under the Security Instrument and the Note, the provisions of this Rider, may, at the investor's discretion, no longer have any force or effect. If thereafter FHLMC or FNMA or any other owner should retransfer the Security Instrument and Note to Lender or Lender's successor in interest, then this Rider shall thereupon be automatically reinstated, without any additional writing or document.

1. LATE CHARGES and ACCRUED INTEREST.

If any installment is not received by Note Holder within fifteen (15) days after its due date, Borrower shall pay Note Holder a late charge in an amount equal to six  percent (6.000%) of the installment due that is applicable to the payment of principal and interest, or $5.00, whichever is greater. If the fifteen day period ends on a weekend or a holiday, the period is extended to the next business day. Borrower acknowledges that it would be difficult and impractical to fix Note Holder's actual damages arising out of any late payment and that the foregoing late payment charge is a reasonable estimate of the same and shall be presumed to be the actual amount. The provisions of this paragraph shall not limit Note Holder's right, under the Security Instrument or otherwise, to compel prompt performance under the Note. Upon default, accrued and unpaid interest shall further bear interest at the then applicable interest rate until paid.

If Borrower is assessed a late charge and sufficient funds are not available in Borrower's checking account when Lender attempts to debit Borrower's loan payment from Borrower's designated checking account, a "returned item charge" will be assessed in addition to the late charge.

2. INTEREST ON PAST DUE SUMS.

If any sum due under the Note is not paid in accordance with the terms of the Note, including accumulated interest, then the sum(s) not paid shall bear interest at the same rate as the principal, or six percent (6.0%) plus the Bank of America Prime rate as publicly announced by the Bank of America National Trust and Savings Association, a National Association as its 'Referenced Rate', whichever is higher, in order to compensate Lender for its enforcement costs arising from the default. In the event the Index ceases to be published, then Note Holder may select a similar alternative published index over which the Note Holder has no control, in which case such alternative index shall become the Index.

1D107-1.UFF v2-5-2007

### 3. NOTE HOLDER'S TREATMENT OF PAYMENTS.

Except as otherwise required by law, Note Holder may apply all payments accepted by Note Holder to any outstanding obligations of Borrower under the Loan Documents in any order or priority Note Holder elects in its sole and absolute discretion. Note Holder may disregard any designation or notation by Borrower (or anyone acting on Borrower's behalf) as to how a payment is to be applied by Note Holder. If Note Holder elects not to accept a payment as permitted under Section 1 of the Security Instrument, Note Holder may return the payment to Borrower regardless of who tendered payment, and in such event, Note Holder shall not have any liability to Borrower or any third party as a result thereof. Borrower shall indemnify, defend, protect and hold Note Holder harmless, from and against all claims, damages, expenses, losses and liabilities, in whatever form, suffered or incurred by Note Holder as a result of Note Holder's return of a payment to Borrower.

### 4. EVENTS OF DEFAULT; REMEDIES.

The following shall constitute additional events of default under the Security Instrument:

(A)   Any person's attempt to reconvey Note Holder's interest in the Property without Note Holder's prior written consent;

(B)   Any person's attempt to have the Note, Security Instrument, this Rider or any of the other Loan Documents declared invalid or unenforceable;

(C)   Failure to pay when due any sum due under any of the Loan Documents;

(D)   Any default under any provision of the Security Instrument; or

(E)   Borrower default under any other deed of trust or other instrument secured by the Property.

Note Holder may use in-house counsel or retain outside lawyers to analyze and respond to any event of default, and Note Holder may charge Borrower reasonable attorneys' fees and costs for such analysis and response. Note Holder may add these legal expenses to the Note and/or demand immediate reimbursement from Borrower. Borrower's failure to promptly reimburse Note Holder shall also constitute an event of default under the Security Instrument.

Upon the occurrence of any events of default, all sums secured by the Security Instrument (including all of Note Holder's attorneys' fees and costs) shall at once become due and payable at the option of Note Holder with or without prior notice by Note Holder and regardless of any prior forbearance. In such event Note Holder, at its option, may then or thereafter deliver to the Trustee a written declaration of default and demand to sell the Property and shall cause to be filed of record a written notice of default and election to cause the Property to be sold. Note Holder shall also deposit with the Trustee the Security Instrument and any notes and all documents evidencing expenditures secured thereby. After the lapse of such time as then may be required by law following recordation of such notice of default, and notice of sale having been given as then required by law, the Trustee, without demand on Borrower, shall sell the Property at the time and place specified by such Trustee in such notice of sale, or at the time to which such noticed sale has been duly postponed, at public auction to the highest bidder for cash in lawful money of the United States, payable at time of sale, except that Note Holder may credit bid at the sale to the extent of the amount owing under the Loan Documents, including the Trustee's fee and expenses. The Trustee may sell the Property as a whole or in separate parcels if there is more than one parcel, subject to such rights as Borrower may have by law to direct the manner or order of sale, or by such other manner of sale which is authorized by law. The Trustee may postpone the sale of all or any portion of the Property by public declaration made by the Trustee at the time and place last appointed for sale. If the Property is sold, the Trustee shall deliver to the purchaser a deed conveying the Property so sold, but without any covenant or warranty, express or implied. The recital in such deed of any matters of fact shall be conclusive proof of the truthfulness thereof.



Any person, including Borrower, the Trustee or Note Holder may purchase at such sale. After deducting all costs, fees and expenses of the Trustee, including costs of evidence of title in connection with such sale, the Trustee shall apply the remaining proceeds of sale first to payment of all sums expended under the terms of the Security Instrument not yet repaid, with accrued interest at the rate then payable under the Note or notes secured thereby, and then to payment of all other sums secured thereby (including the Note). If there be any proceeds remaining, the Trustee shall distribute them to the person or persons legally entitled thereto.

## 5. HAZARD OR PROPERTY INSURANCE.

Unless Note Holder and Borrower otherwise agree in writing, any insurance proceeds shall be applied first to reimburse Note Holder for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Note Holder's option, in such order and proportion as it may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by the Security Instrument, whether or not then due, and to such components thereof as Note Holder may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Note Holder. If Borrower abandons the Property, or does not answer within 30 days a notice from Note Holder that the insurance carrier has offered to settle a claim, then Note Holder may collect the insurance proceeds. Note Holder may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by the Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

If Borrower obtains earthquake insurance, and other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Note Holder, then (i) Borrower must ensure that such insurance names Note Holder as loss payee and (ii) such insurance shall be subject to this paragraph with respect to use of insurance proceeds.

Note Holder may charge a reasonable fee for the cost of determining whether the building or mobile home securing a loan is located in an area having special flood hazards, subject to applicable law.

## 6. BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE.

Borrower may repay the principal due under the Note at any time. A payment of principal only prior to the Maturity Date (beyond the principal included in the regular monthly payments) is known as a 'Prepayment.' When Borrower makes a Prepayment, Borrower must tell Note Holder in writing that Borrower is doing so. Borrower may not designate a payment as a Prepayment if Borrower has not made all the monthly principal and interest payments due under the Note.

Borrower may make a full Prepayment or qualifying partial Prepayment(s) as long as Borrower pays a Prepayment charge equal to six (6) months' advance interest on any Prepayment(s) made in any twelve (12) month period in excess of twenty percent (20%) of the original principal amount of the Note, at the interest rate in effect under the Note as of the date of each Prepayment. There will be no Prepayment charge for Prepayment(s) made more than three (3) years after the date of the Note. If the Note is an Adjustable Rate Note, the fully indexed interest rate in effect under such Note (i.e. the margin plus the index as defined in such Note), as of the date of any such Prepayment, will be used to calculate the Prepayment charge, subject to any interest rate limit set forth in such Note and without regard to temporary interest rate reductions.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider.

_____(Seal)          _____(Seal)
ADAN  ORELLANA                  -Borrower                                       -Borrower


_____(Seal)          _____(Seal)
                                -Borrower                                       -Borrower


_____(Seal)          _____(Seal)
                                -Borrower                                       -Borrower


_____(Seal)          _____(Seal)
                                -Borrower                                       -Borrower